FILED

APR 0 8 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANE DOE 130,
          Plaintiff,

                                         CV 08-193-PK

                                         FINDINGS AND
v.                                       RECOMMENDATION

THE ARCHDIOCESE OF PORTLAND IN
OREGON, THE ROMAN CATHOLIC
ARCHBISHOP OF PORTLAND IN OREGON,
and FR. J.V.H.,
          Defendants.

PAPAK, Magistrate Judge:

      Fictitiously-named plaintiff Jane Doe 130 ("Jane") filed this action against defendants

The Archdiocese of Portland in Oregon (the "Archdiocese"), The Roman Catholic Archbishop of

Portland in Oregon (the "Archbishop" and, collectively with the Archdiocese, the "archdiocesan

defendants"), and Father J. V. H. on February 14, 2008. On November 26, 2008, Farley, Piazza

& Associates were appointed as Jane's guardian *ad litem.* Jane alleges defendants' vicarious

liability for sexual battery of a child prior to July 6, 2004,[1] sexual battery of a child following

---

     [1] Claims arising prior to July 6, 2004, are to be paid out of the future claims fund, and are subject to the cap on the total amount to be paid toward such claims *see infra,* whereas claims arising on or after July 6, 2004, constitute administrative claims against the archdiocesan defendants outside the scope of the future claims fund.

Page 1 - FINDINGS AND RECOMMENDATION AND ORDER

July 6, 2004, intentional infliction of emotional distress prior to July 6, 2004, and intentional

infliction of emotional distress following July 6, 2004, on a theory of *respondeat superior*, and

direct liability for negligence and for misrepresentation. This court has jurisdiction over Jane's

action pursuant to 28 U.S.C. § 1334(b), based on the relatedness of these proceedings to a case

arising under Title 11 of the United States Code.[2]

Now before the court are Jane's motion (#44) to compel production of documents from

the archdiocesan defendants, the archdiocesan defendants' motion (#52) to dismiss, and the

archdiocesan defendants' motion (#54) for judicial notice. I have considered the parties' motions,

oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth

below, I recommend that the motion to compel be denied, that the motion to dismiss be denied as

moot as to Jane's claim for misrepresentation and otherwise denied, and that the motion for

judicial notice be granted in part and denied in part as set forth below.

## LEGAL STANDARDS

### I.      Motion for Judicial Notice

Federal Rule of Evidence 201(d) provides that "[a] court shall take judicial notice [of an

adjudicative fact] if requested by a party and supplied with the necessary information." An

adjudicative fact is subject to judicial notice when the fact is "not subject to reasonable dispute in

that it is either (1) generally known within the territorial jurisdiction of the trial court or (2)

capable of accurate and ready determination by resort to sources whose accuracy cannot be

---

[2] Specifically, this action is subject to the future claims fund under the Third Amended
and Restated Joint Plan of Reorganization confirmed in *In re Roman Catholic Archbishop of
Portland*, 04-37154, which, in relevant part, sets a $20 million cap on the total funds available to
pay all claims made against the Archdiocese through 2023.

reasonably questioned." Fed. R. Evid. 201(b).

## II.    Motion to Dismiss

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint

must contain more than a "formulaic recitation of the elements of a cause of action;" specifically,

it must contain factual allegations sufficient to "raise a right to relief above the speculative level."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To raise a right to relief above the

speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts

that merely creates a suspicion [of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright

& A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R.

Civ. P. 8(a).  Instead, the plaintiff must plead affirmative factual content, as opposed to any

merely conclusory recitation that the elements of a claim have been satisfied, that "allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009).  "In sum, for a complaint to survive

a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that

content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United*

*States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), *citing Iqbal*, 129 S. Ct. at 1949.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained

in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial

notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).  In considering a motion to

dismiss, this court accepts all of the allegations in the complaint as true and construes them in the

light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007).

Moreover, the court "presume[s] that general allegations embrace those specific facts that are

necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not, however, accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## III.    Motion to Compel

Federal Civil Procedure Rule 26(b)(1) authorizes discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Rule 26(b)(1) is to be construed broadly, and encompasses any matter that bears on, or that reasonably could lead to other matters that would bear on, any issue that is or may be in the case. *See, e.g., Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 351 n. 12 (1978).

If a party elects to oppose a propounding party's discovery requests, the opposing party bears the burden of establishing that the discovery is overly broad, unduly burdensome or not relevant. *See Graham v. Casey's General Stores*, 206 F.R.D. 251, 253-4 (S.D. Ind. 2000). "Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all." *Walker v. Lakewood Condominium Owners Assoc.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999); *see also Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal. 2006).

Federal Civil Procedure Rule 37(a)(3)(B) empowers a propounding party to "move for an order compelling an answer, designation, production, or inspection" if:

(i) a deponent fails to answer a question asked under Rules 30 or 31;

(ii) a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a)(4);

(iii) a party fails to answer an interrogatory submitted under Rule 33, or

(iv) a party fails to respond that inspection will be permitted — or fails to permit inspection — as requested under Rule 34.

Fed. R. Civ. Pro. 37(a)(3)(B).  Moreover, Rule 37(a)(4) provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4).  Rule 26 provides that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."  Fed. R. Civ. Pro. 26(b)(1).

## FACTUAL BACKGROUND

Jane is a minor female born in 1991.  Between August of 1993 and June of 1999, J.V.H. was a seminarian at Mt. Angel Seminary in Oregon, an educational institution within the authority of the archdiocesan defendants.  Between June 1999 and 2007, Fr. J.V.H. was a Catholic priest directly employed by the Archdiocese Defendants.  Jane alleges that Fr. J.V.H. provided pastoral and educational services to her in his capacity as a priest,[3] in the course of which he acted within the course and scope of his employment or agency in performing duties for and on behalf of the archdiocesan defendants.

## I.      History of the Parties' Dispute

Jane testified in deposition that J.V.H. first began touching her sexually when she was approximately 6 or 7 years old, in or around 1997.  At that time, Jane lived in Virginia, and J.V.H. was a seminary student in Mt. Angel, Oregon.  The initial sexual touching took place in Virginia, in Jane's grandmother's home.

J.V.H. was ordained as a priest of the Archdiocese of Portland in June 1999.  Jane moved to Portland, Oregon, in 2004, when she was approximately 14.  It appears that Fr. J.V.H.

---

[3] Although the parties have asserted in other contexts that J.V.H. is Jane's paternal uncle, Jane's blood relationship to J.V.H. is not alleged in the complaint.

Page 5 - FINDINGS AND RECOMMENDATION AND ORDER

continued abusing Jane from approximately 1997 through some time in 2004, after Jane's family

moved to Oregon.

Neither Jane nor her parents have ever been members of a parish to which Fr. J.V.H. was

assigned. The Archdiocese has not received any complaints of sexual misconduct by Fr. J.V.H.

other than in connection with this action.

## II.    Allegations Underlying Jane's Claims Against the Defendants

Jane alleges that:

> For the purpose of furthering his duties as a priest, Fr. J.V.H. sought and gained
> the trust, admiration, and obedience of the Plaintiff in this case. Plaintiff was also
> conditioned by her church, school and family to respect and obey priests,
> including Fr. J.V.H.. As a result, Plaintiff was conditioned to trust Fr. J.V.H., to
> comply with Fr. J.V.H.'s direction, and to respect Fr. J.V.H. as a person of
> authority in spiritual, moral and ethical matters.

In her complaint, Jane refers to this process as one of "Grooming." She alleges that:

> The Grooming process led to Fr. J.V.H.'s acts of sexual molestation of the
> Plaintiff. . . . Fr. J.V.H.'s Grooming of Plaintiff was (1) committed in direct
> connection [sic] and for the purposes of fulfilling his employment and agency
> with Archdiocese Defendants; (2) committed within the time and space limits of
> his agency and employment; (3) done initially and at least in part from a desire to
> serve the interests of the Archdiocese Defendants; (4) done directly in the
> performance of his duties; (5) generally consisted of actions the kind and nature of
> which Fr. J.V.H. was required to perform; and (6) was done at the direction of,
> and pursuant to, the power vested in him by the Archdiocese Defendants.

Jane further alleges that Fr. J.V.H., "while acting within the course and scope of his

employment and agency, and using the authority and position of trust as a priest for the

Archdiocese Defendants—through the Grooming process—induced and directed Plaintiff to

engage in sexual contact with Fr. J.V.H. both prior to and after July 6, 2004." She alleges that

this sexual abuse continued for approximately six years, from a time when she was

approximately eight years old to a time when she was approximately 14.

In connection with Jane's claims against the archdiocesan defendants for sexual battery of a child and for intentional infliction of emotional distress, alleged on a theory of *respondeat superior*, Jane alleges that "Fr. J.V.H. used the Grooming process to accomplish his sexual battery of Plaintiff," and that "Fr. J.V.H. used the Grooming process to intentionally inflict severe emotional distress by his acts of sexual molestation of the Plaintiff."

In connection with Jane's claim against the archdiocesan defendants for negligence, alleged on a theory of direct liability, Jane alleges as follows. First, she alleges that the archdiocesan defendants owed her a special duty of care:

> As a young girl entrusted to the care and influence of the Catholic Church and Fr. J.V.H., an agent and employee of Archdiocese Defendants, Plaintiff has a special relationship with Defendants. This special relationship created a requirement that Archdiocese Defendants act with care to ensure Plaintiff's safety while interacting with Archdiocese Defendants' agents and employees.

Second, she alleges that the archdiocesan defendants had notice that Fr. J.V.H. posed a threat to children by not later than August 1993:

> By approximately August of 1993, prior to final acceptance of Fr. J.V.H. as a priest, Archdiocese Defendants became aware that Fr. J.V.H. posed an emotional, physical or sexual danger to those in his care and influence. Specifically, Archdiocese Defendant had knowledge of the following facts:
>
> A.    Archdiocese Defendants knew that Fr. J.V.H. had left the Holy Cross Fathers, and knew or should have known that a part of the reason for his leaving was the resistance Fr. J.V.H. received from the Holy Cross Fathers in response to his quest towards becoming a priest.
>
> B.    Archdiocese Defendants knew from Fr. J.V.H.'s screening psychological examinations that evaluators had concerns about whether he was being truthful and accurate with them in relation to his sexuality.

C.      Archdiocese Defendants knew from Fr. J.V.H.'s screening
        psychological examinations that Fr. J.V.H. had reported to
        evaluators that he was concerned that psychological testing might
        indicate he was a child molester.

D.      Archdiocese Defendants knew from Fr. J.V.H.'s psychological
        examinations that evaluators recommended that the Archdiocese
        Defendants' formation team closely monitor him regarding sexual
        matters.

Prior to the last of the abuse suffered by Plaintiff, Archdiocese Defendants knew
or should have known that Fr. J.V.H. was repeatedly ineffective in his
assignments for reasons centering around lack of energy or initiative. This
knowledge might have been unremarkable in isolation, but taken in conjunction
with the factors listed in subparagraphs A - D, above, should have indicated to
Archdiocese Defendants that Fr. J.V.H. was emotionally unwell, that his celibacy
was at risk, and that children in his care might be unsafe.

Third, she alleges that the archdiocesan defendants were actionably negligent in the following

ways:

A.      Failing to investigate or otherwise follow up on findings in Fr. J.V.H.'s
        psychological examinations that indicated that evaluators had concerns
        about the accuracy of Fr. J.V.H.'s reporting regarding his sexuality.

B.      Failing to investigate or otherwise follow up on findings in Fr. J.V.H.'s
        psychological examinations that indicated that Fr. J.V.H. had concerns that
        the results of the examinations would indicate that he was a child molester.

C.      Failing to supervise, monitor, or otherwise follow the recommendation of
        professional psychologists that Fr. J.V.H. be watched closely, including
        failing to watch, supervise and monitor Fr. J.V.H. closely throughout his
        formation, particularly in relation to his interactions with minors.

D.      Failing to either remove Fr. J.V.H. from ministry or to restrict or monitor
        his interactions with those under his care and influence.

Fourth, she alleges that:

Archdiocese Defendants' failure to investigate, monitor, supervise, restrict, or
remove Fr. J.V.H. during his formation and ministry, despite having received
notice of his danger to those under his care and influence, created a foreseeable

Page 8 - FINDINGS AND RECOMMENDATION AND ORDER

risk of harm to the safety of those in his care and influence, including Plaintiff in this case. Plaintiff's interest in being free from sexual and physical abuse is an interest of a kind that the law protects against negligent invasion. Archdiocese Defendants' failure to investigate, monitor, supervise, restrict, or remove Fr. J.V.H. once Archdiocese Defendants knew of his danger to those under his care and influence was unreasonable in light of the risk posed to children in his charge. Archdiocese Defendants' failure to investigate, monitor, supervise, or remove Fr. J.V.H. was a cause of the abuse and molestation suffered by Plaintiff . . . . Finally, as a child who was sexually and physically assaulted, Plaintiff was within the class of persons and Plaintiff's injury was within the general type of potential incidents and injuries that made Archdiocese Defendants' conduct negligent.

In connection with her claim of entitlement to punitive damages, Jane alleges as follows:

In their negligence toward the rights and safety of Plaintiff, Archdiocese Defendants acted with malice or a reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety and welfare of Plaintiff. Plaintiff is therefore entitled to punitive damages against Archdiocese Defendants in the amount of $10,000,000.00.

## III.    History Underlying the Parties' Discovery Dispute

On July 28, 2009, Jane served the archdiocesan defendants with a set of requests for

production of documents. On September 2, 2009, the archdiocesan defendants responded to the

requests for production, *inter alia* refusing to produce documents responsive to Request for

Production No. 23. Jane now seeks to compel production of documents responsive to Request

for Production No. 23, and the archdiocesan defendants seek a protective order as to that same

request.

Request for Production No. 23, and the archdiocesan defendants' response thereto, are as

follows:

**REQUEST NO. 23:** All demand letters, responses and copies of (initial, not amended) civil complaints regarding all child sexual abuse claims made against the Archdiocese of Portland from [1975] to 2004. In the alternative, Defendants may satisfy this Request in its response to Plaintiff's Second Set of Interrogatories to Archdiocesan Defendants.

**RESPONSE:** The Archdiocese respectfully objects to this Request on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and outside the scope of permissible discovery in this case and it seeks documents which are irrelevant, immaterial, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Further objection: This Request seeks information that is sensitive and confidential and would require Archdiocese to disclose the identity of prior claimants in violation of assurances of anonymity given to these persons by the bankruptcy court where they filed their claims, by Oregon courts which allowed them to proceed under their initials rather than their names, or in their settlement agreements.

Notwithstanding these objections, the Archdiocese has received no prior claims of sexual abuse against Fr. JVH, the accused in the present case.

## ANALYSIS

I.   **Motion for Judicial Notice**

The archdiocesan defendants move for judicial notice of the following facts:

(1)     Plaintiff Jane Doe 130 in this case is the niece of defendant Fr. J.V.H.

(2)     The Archdiocese is a Roman Catholic, non-profit organization that operates as a corporation sole to fulfill its religious and charitable mission.

(3)     In 1983, a former priest in the Archdiocese, Thomas B. Laughlin, was criminally convicted of sexual abuse.

(4)     In October 2000, Archbishop John G. Vlazny issued a public apology that was read during Sunday mass at all parishes in the Archdiocese that acknowledged and apologized for sexual abuse that some priests in the Archdiocese had committed against children.

(5)     On July 6, 2004, the Archdiocese became the first Roman Catholic diocese in the United States to file Chapter 11 bankruptcy.

(6)     At the time of the Archdiocese's bankruptcy filing, it was widely reported by the news media that the Archdiocese's bankruptcy filing was prompted by the costs of legal actions against the Archdiocese for alleged sexual abuse by Roman Catholic priests who had served within the Archdiocese.

(7)     Reports by the news media of serious allegations of sexual abuse by some Roman Catholic priests were in the public realm well before the

Archdiocese's bankruptcy filing.

As noted above, an adjudicative fact is subject to judicial notice when the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Here, the familial relationship between defendant Fr. J.V.H. and Jane is clearly not a fit matter for judicial notice. It is rather a matter of purely private import, not generally known in this district, and I am unaware of any unimpeachably authoritative source by which it could be determined. Similarly, to notice facts employing value-laden qualifiers such as "widely" in the purported fact that "it was widely reported by the news media that the Archdiocese's bankruptcy filing was prompted by the costs of legal actions against the Archdiocese" would require questions of judgment as to what such qualifiers might mean in the contexts in which they are proposed, and therefore can be neither generally known nor accurately determined.

By contrast, the remaining putative facts, stripped of all vague, value-laden qualifiers, are each either generally known or readily determinable, and are therefore fit matters for judicial notice. I recommend that the motion for judicial notice be granted in part and denied in part, and that the court take judicial notice of the following facts for the purpose of determining the archdiocesan defendants' motion to dismiss:

(1)     The Archdiocese is a Roman Catholic, non-profit organization that operates as a corporation sole.

(2)     In 1983, a former priest of the Archdiocese, Thomas B. Laughlin, was criminally convicted of sexual abuse.

(3)     In October 2000, Archbishop John G. Vlazny issued a public apology that

acknowledged and apologized for sexual abuse that priests in the
Archdiocese had committed against children.

(4)     On July 6, 2004, the Archdiocese filed for Chapter 11 bankruptcy.

(5)     Following the Archdiocese's bankruptcy filing, it was reported in news
media that the filing was prompted by the costs of legal actions against the
Archdiocese for alleged sexual abuse by Archdiocesan priests.

(6)     News reports of allegations of sexual abuse by Archdiocesan priests issued
prior to the Archdiocese's bankruptcy filing.

## II.     Motion to Dismiss

The archdiocesan defendants move to dismiss Jane's claims against them for sexual

battery of a child and for intentional infliction of emotional distress on the grounds that Jane has

not met her burden to plead the elements of *respondeat superior* liability.  The archdiocesan

defendants likewise move to dismiss Jane's claim against them for negligence, on the ground that

Jane has not met her burden to plead that the archdiocesan defendants owed her any particular

duty of care, and on the alternative ground that the archdiocesan defendants enjoy First

Amendment protections that foreclose Jane's claims.  The archdiocesan defendants also move to

dismiss Jane's claim for punitive damages.  Finally, the archdiocesan defendants move to dismiss

Jane's misrepresentation claim.  Jane does not oppose the motion to the extent it seeks dismissal

of the misrepresentation claim, and instead asserts that she will voluntarily dismiss that claim

without prejudice.

### A.     *Respondeat Superior* Liability (Sexual Battery of a Child; Intentional
Infliction of Emotional Distress)

According to Oregon law:

Under the doctrine of *respondeat superior*, an employer is liable for an employee's
torts when the employee acts within the scope of employment.  Negligence or

other tortious conduct by the employer is not required. . . .

> Three requirements must be met to conclude that an employee was acting within
> the scope of employment. These requirements traditionally have been stated as:
> (1) whether the act occurred substantially within the time and space limits
> authorized by the employment; (2) whether the employee was motivated, at least
> partially, by a purpose to serve the employer; and (3) whether the act is of a kind
> which the employee was hired to perform.

*Chesterman v. Barmon*, 305 Or. 439, 442 (1988) (citations omitted).

The *Chesterman* court specified, however, that where there is a "'time-lag' between the act
allegedly producing the harm and the resulting harm," it is inappropriate to analyze the
applicability of the *respondeat superior* doctrine "as of the time that the injury occurred." *Id.* at
444. Under that circumstance, the court ruled, "[t]he focus should be on the *act* on which
vicarious liability is based and not on when the act results in *injury*." *Id.* (emphasis original).
Applying that principle, the court found that an employer could be vicariously liable for its
employee's acts where the employee ingested a hallucinogenic drug allegedly for the purpose of
maintaining focus at work and then later, outside the workplace and outside the scope of his
employment – but still under the influence of the drug and, allegedly, in consequence of the
drug's effects – entered a woman's home and sexually assaulted her. *See id.* at 443-444.

Eleven years later, in a case (like the one now before the court) involving sexual assault
allegedly committed by an employee of the Archdiocese, the Oregon Supreme Court had
occasion to clarify the *Chesterman* ruling. Noting that "an employee's intentional tort rarely, if
ever, will have been authorized expressly by the employer," the court in *Fearing v. Bucher*, 328
Or. 367 (1999), acknowledged that the employee's "sexual assaults . . . clearly were outside the
scope of his employment," but held that "the [vicarious liability] inquiry does not end there."

*Fearing v. Bucher*, 328 Or. 367, 374, 374 n. 4 (1999). Instead, the court held, "[t]he Archdiocese still could be found vicariously liable, if acts that were within [the employee]'s scope of employment *resulted in* the acts which led to injury to plaintiff." *Id.* (citation, internal quotation marks omitted; emphasis supplied). That is, "where . . . the employer's vicarious liability arises out of the employee's commission of an intentional tort, [the court] must consider whether . . . allegations contained in the . . . complaint state ultimate facts sufficient to establish that acts that were within [the employee]'s scope of employment resulted in the acts that caused injury to plaintiff." *Id.*

The *Fearing* court recited the material allegations of the plaintiff's complaint as follows:

> The complaint alleges that [the employee priest] used his position as youth pastor, spiritual guide, confessor, and priest to plaintiff and his family to gain their trust and confidence, and thereby to gain the permission of plaintiff's family to spend large periods of time alone with plaintiff. By virtue of that relationship, [the employee] gained the opportunity to be alone with plaintiff, to touch him physically, and then to assault him sexually. The complaint further alleges that those activities were committed in connection with [the employee]'s employment as youth pastor and priest, that they were committed within the time and space limitations of [the employee]'s employment, that they were committed out of a desire, at least partially and initially, to fulfill [the employee]'s employment duties as youth pastor and priest, and that they generally were of a kind and nature that was required to perform as youth pastor and priest.

*Id.* Based on these allegations, the *Fearing* court reasoned that "a jury could infer that the sexual assaults were the culmination of a progressive series of actions that began with and continued to involve [the employee]'s performance of [his] ordinary and authorized duties." *Id.* at 375.

> Viewing the complaint in that light, the jury also could infer that, in cultivating a relationship with plaintiff and his family, [the employee], at least initially, was motivated by a desire to fulfill his . . . duties and that, over time, his motives became mixed. We conclude that the . . . complaint contains allegations sufficient

> to satisfy all three *Chesterman* requirements for establishing that employee
> conduct was within the scope of employment.

*Id.* The *Fearing* court expressly rejected the Archdiocese's argument that the allegations of the

complaint amounted only to legal conclusions or mere restatements of the *Chesterman* factors

themselves. *Id.* at 375 n. 5. The court reasoned that:

> An ultimate fact is a fact from which legal conclusions are drawn. A conclusion
> of law, by contrast, is merely a judgment about a particular set of circumstances
> and assumes facts that may or may not have been pleaded. . . . Allegations of
> when particular conduct occurred, of the motivation behind that conduct, and of
> the employment-related nature of that conduct all are assertions of fact, which can
> be proved or disproved.

*Id.* (citations omitted).

The *Fearing* court further expressly rejected the argument that, because the alleged sexual

abuse could not reasonably have furthered any interest of the employer, it could not have been

within the scope of the employee's duties, reasoning that:

> in the intentional tort context, it usually is inappropriate for the court to base its
> decision regarding the adequacy of the complaint on whether the complaint
> contains allegations that the intentional tort *itself* was committed in furtherance of
> any interest of the employer or was of the same kind of activities that the
> employee was hired to perform. Such circumstances rarely will occur and are not,
> in any event, necessary to vicarious liability. Rather, the focus properly is directed
> at whether the complaint contains sufficient allegations of [the employee]'s
> conduct that was within the scope of his employment that arguably resulted in the
> acts that caused plaintiff's injury.

*Id.* at 375-376 (emphasis original).

The *Fearing* court specifically distinguished the facts before it from those where the

circumstances of employment merely created an *opportunity* for an intentional tort to be

committed, indicating that mere opportunity was not sufficient to support a finding of vicarious

liability:

Page 15 - FINDINGS AND RECOMMENDATION AND ORDER

> Here, plaintiff alleges that [the employee] "used and manipulated his fiduciary
> position, respect and authority as youth pastor and priest" to befriend plaintiff and
> his family, gain their trust, spend large periods of time alone with plaintiff,
> physically touch plaintiff and, ultimately, to gain the opportunity to commit the
> sexual assaults upon him. A jury reasonably could infer that [the employee]'s
> performance of his pastoral duties with respect to plaintiff and his family were a
> necessary precursor to the sexual abuse and that the assaults thus were a direct
> outgrowth of and were engendered by conduct that was within the scope of [the
> employee]'s employment.

*Id.* at 377 (citation omitted).

Finally, the *Fearing* court also affirmed the well-established proposition that "[w]hether

an employee has acted within the scope of employment at any given time generally is a question

for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the

facts pled." *Id.* at 374.

Shortly after the *Fearing* opinion issued, in *Lourim v. Swensen*, 328 Or. 380 (1999), a

case involving sexual assault upon a minor Boy Scout by a Boy Scout troop leader, the Oregon

Supreme Court relied upon the same reasoning employed in *Fearing* to conclude that an

extended course of employment-related cultivation of the trust of a minor and his family could

give rise to vicarious employer liability. The *Lourim* court recited the material facts of the

plaintiff's complaint as follows:

> From 1965 to 1967, [the employee defendant] was a volunteer Boy Scout leader,
> duly authorized by the Boy Scouts to act as such. As part of his volunteer duties
> with the Boy Scouts, he was directed to fulfill the role of troop leader or assistant
> troop leader to plaintiff's troop. Plaintiff and his family became close to [the
> employee defendant], and [the employee defendant] was a frequent guest in their
> home. [The employee defendant] gained the trust and confidence of plaintiff's
> family as a suitable friend, guide, mentor, and role model to plaintiff, then an
> adolescent. By virtue of that relationship, [the employee defendant] gained the
> support, acquiescence, and permission of plaintiff's family to spend substantial
> periods of time alone with plaintiff.

[The employee defendant] also won the friendship and admiration of plaintiff himself. He was his mentor and role model. [The employee defendant] gained the opportunity to socialize with plaintiff and to spend time alone with him and together with other boys in remote places. [The employee defendant] also used his position of trust to gain the opportunity to touch plaintiff physically. Eventually, [the employee defendant] committed a series of sexual assaults on plaintiff. At the time of those assaults, plaintiff was a minor.

The complaint describes [the employee defendant]'s performance of his duties as troop leader in developing a trust relationship with plaintiff and his family, together with the eventual sexual assaults, as "manipulations." Plaintiff alleges in the complaint that the manipulations were committed in connection with [the employee defendant]'s performance of his duties as troop leader:

> "The manipulations * * * were committed within the time and space limits of his responsibilities as troop leader, were committed out of a desire, at least initially and partially, to fulfill his duties as troop leader, and were generally actions of a kind and nature which [the employee defendant] was required to perform as troop leader."

*Lourim*, 328 Or. at 384-385. Accepting these allegations as true, and applying the principles articulated in *Fearing*, the court concluded that "a jury reasonably could infer that the sexual assaults were merely the culmination of a progressive series of actions that involved the ordinary and authorized duties of a Boy Scout leader." *Id.* at 396. The court further concluded that:

> a jury could infer that, in cultivating a relationship with plaintiff and his family, [the employee defendant], at least initially, was motivated by a desire to fulfill his duties as troop leader and that, over time, his motives became mixed. A jury also reasonably could infer that [the employee defendant]'s performance of his duties as troop leader with respect to plaintiff and his family was a necessary precursor to the sexual abuse and that the assaults were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee defendant]'s employment. Finally, a jury could infer that [the employee defendant]'s contact with plaintiff was the direct result of the relationship sponsored and encouraged by the Boy Scouts, which invested [the employee defendant] with authority to decide how to supervise minor boys under his care. Based on the foregoing, we conclude, as we did in *Fearing*, that the amended complaint contains allegations sufficient to satisfy all three *Chesterman* requirements.

*Id.* at 386-387.

Page 17 - FINDINGS AND RECOMMENDATION AND ORDER

Similarly, in *Bray v. American Prop. Mgmt. Corp.*, 164 Or. App. 134 (1999), the Oregon

Court of Appeals applied the *Fearing/Lourim* standard to find an employer vicariously liable for

its employee's actions when an employee fatally stabbed a third party in the workplace. The third

party habitually parked a delivery van in the defendant's parking garage without permission, and

the defendant instructed its employee parking attendant to prevent the third party from continuing

to do so; the defendant neither authorized nor prohibited the use of force in carrying out its

instruction. *See Bray*, 164 Or. App. at 136-137. When the attendant informed the third party that

he could no longer park in the garage, a scuffle ensued which culminated in the attendant killing

the third party with a knife. *See id.* at 137. The court concluded that:

> as in *Fearing* and *Lourim*, the jury could find that **the stabbing was merely the
> culmination of a progressive series of actions that involved [the attendant's]
> ordinary and authorized duties.** That is, reasonable jurors could find that the
> stabbing was the product of the escalating antagonism between [the attendant] and
> [the third party] centering on [the third party]'s obstruction of access to the
> parking garage and use of that garage. . . . Moreover, reasonable jurors could find
> that **[the employer]'s directive to [the attendant] not to permit [the third
> party] to park in the garage was a necessary precursor to the stabbing and
> that the stabbing was a direct outgrowth and was engendered by conduct
> that was within the scope of [the attendant's] employment,"** *viz.*, [the
> attendant]'s telling [the third party] that he could not park in the garage.

*Bray*, 164 Or. App. at 140-141 (emphasis supplied; citations, internal quotation marks, and

modifications omitted). The court expressly observed that, under "*Fearing* and *Lourim*, direct

causation, not 'reasonable foreseeability' . . . , is the *sine qua non* of *respondeat superior*

liability." *Id.* at 141.

Three years later, in *Minnis v. Oregon Mutual Ins. Co.*, 334 Or. 191 (2002), the Oregon

Supreme Court found that no vicarious liability attached in connection with a managerial

employee's sexual assault of an employee under his supervision. The managerial employee

Page 18 - FINDINGS AND RECOMMENDATION AND ORDER

allegedly both sexually harassed the supervised employee in the workplace and sexually

assaulted her outside the workplace, specifically in his own apartment. *See Minnis*, 334 Or. at

197. The *Minnis* court held that because the *Minnis* plaintiff had testified that the workplace

conduct and the sexual assault were "episodes in a series," rather than that the sexual harassment

"*resulted in* or *caused*" the sexual assault, "the *Chesterman* 'time-lag' standard" was inapplicable,

and the *respondeat superior* test was to be applied solely to the conduct taking place at the

managerial employee's apartment. *Id.* at 202 (emphasis original), 203. Because this conduct was

not within the manager's employment duties, the court found that the employer was not

vicariously liable under *Chesterman*. *See id.* at 203-204. The *Minnis* court expressly

distinguished *Fearing* and *Lourim* on the ground that the tortfeasor's workplace conduct had not

been alleged to be a necessary precursor or otherwise a cause of the subsequent sexual assault.

*See id.* at 204-206.

  The Oregon Court of Appeals recently applied the *Fearing/Lourim* standard once again to

allegations of sexual assault by priest employees of the Archdiocese. In *Schmidt v. Archdiocese

of Portland*, 218 Or. App. 661 (Or. Ct. App. 2008), Father F., one of two priests alleged to have

molested the plaintiff during his minority, was present when the plaintiff, then aged seven or

eight, fell while rollerskating and skinned his knees. *Schmidt*, 218 Or. App. at 665. Fr. F. helped

the boy to his feet, took him into a church basement on the pretext of examining his scraped

knees, and there sodomized him. *See id.* The plaintiff had never met his abuser before the

incident occurred. *See id.* at 667, 694.

  In analyzing whether the priest's employers could be found vicariously liable for their

agent's sexual assault, the *Schmidt* court affirmed the *Fearing* court's holding that:

Page 19 - FINDINGS AND RECOMMENDATION AND ORDER

> in the intentional tort context, the relevant question is not whether the intentional
> tort itself was committed in furtherance of any interest of the employer or
> involved the kind of activity that the employee was hired to perform [but]
> [r]ather. . . whether there is evidence of acts that were within the scope of
> employment that, in turn, **resulted in** the acts that caused the plaintiff's injury.

*Id.* at 690 (emphasis supplied). Applying that analysis, the court found, first, that the record

contained no evidence that Fr. F. had, as had the priest in *Fearing*, cultivated a relationship of

trust with his victim before assaulting him. *See id.* at 694. Next, "[a]s an alternative to

cultivation of a trust relationship as a basis for imposing vicarious liability," the court analyzed

the priest's conduct immediately preceding the assault to determine whether the record contained

"evidence of conduct by [Fr. F.] that was motivated, at least in part, by a purpose to serve the

archdiocese; that was of a kind that [Fr. F.] was hired to perform; and that resulted in the acts

causing plaintiff's injury" *Id.* The court found that the record contained no evidence from which

a jury could conclude either that the priest had been motivated to serve his employer by picking

up the fallen child and taking him into a church basement or that helping fallen children was

among his authorized employment duties. *See id.* at 695-696. The court expressly found

evidence that Roman Catholic priests were expected to care for their parishioners insufficient to

establish a particular employment duty to do so. *See id.* ("[a]bstract doctrine regarding the status

of priests within the Catholic Church sheds no light on the question whether the particular

actions at issue here were employment duties imposed on [this priest], in his capacity as a parish

priest of St. Mary's Church, by the archdiocese"). Similarly, the court expressly found "evidence

relating to the respect and obedience that parishioners are trained to show to priests" -- including

plaintiff's own affidavit that he believed from Catholic teaching that he had no choice but to obey

a priest's commands – irrelevant to the question whether Fr. F. was carrying out authorized

employment duties when he took the boy into the church basement. *Id.* at 696. Based on these findings, the court affirmed summary judgment in favor of the employer defendants. *See id.*

Here, it is clear that Jane has alleged that Fr. J.V.H. engaged in conduct referred to as "grooming" her within the course and scope of his employment duties, and that such grooming resulted in the abuse she suffered.[4] For purposes of the archdiocesan defendants' motion to dismiss, these allegations must be accepted as true. However, Jane has further alleged that J.V.H. began abusing her before he became a priest, and therefore that the abuse she suffered began before J.V.H. could have owed the archdiocesan defendants any employment duties. At a minimum, therefore, the sexual abuse Jane suffered before J.V.H. was ordained and before he became an employee of the Archdiocese could not have resulted from grooming that occurred within the course and scope of Fr. J.V.H.'s employment duties, and cannot give rise to *respondeat superior* liability. Indeed, Jane's allegations raise serious concerns as to whether Jane will be able to establish that *any* of the abuse she suffered was a consequence of actions Fr. J.V.H. took in furtherance of his employment duties. These concerns, however, are properly addressed by motion for summary judgment or at trial rather than at this stage of these proceedings.

Despite these concerns, for purposes of the archdiocesan defendants' motion to dismiss I

---

[4] At oral argument, Jane's counsel expressly disavowed the "grooming" theory of *respondeat superior* liability alleged in Jane's second amended complaint and argued instead that, as in *Bray, supra,* the abuse Jane suffered was "the culmination of a progressive series of actions that involved [Fr. J.V.H.'s] ordinary and authorized duties." *Bray,* 164 Or. App. at 140. In offering this argument, counsel gave short shrift to the conceded fact that the bulk of the putative progressive series of actions took place before Fr. J.V.H. became an employee of the archdiocesan defendants. Nevertheless, the merits of the archdiocesan defendants' motion to dismiss must be measured against the allegations of Jane's pleading rather than against the argument offered by her counsel, so I disregard counsel's disavowal of Jane's allegations.

construe the allegations of the complaint in the light most favorable to Jane and therefore

acknowledge the logical possibility that at or around the time of Fr. J.V.H.'s ordination the abuse

would not have continued but for the alleged employment-related grooming. On this construal of

Jane's allegations, Jane's allegations state claims for sexual battery of a child and for intentional

infliction of emotional distress, and meet the *Fearing/Lourim* standard for establishing an

employer's vicarious liability. That is, she has alleged that Fr. J.V.H. engaged in conduct of a

kind he was (allegedly) hired to perform, that in engaging in this conduct he was motivated, at

least in part, to serve his employer, and that the conduct took place within the time and space

limits authorized by his employment, *see Chesterman*, 305 Or. at 442, and that this conduct later

resulted in the abuse she suffered at his hands, *see Fearing*, 328 Or. at 375-376. In consequence,

I conclude that Jane has met her burden at the pleading stage of these proceedings[5] to state the

archdiocesan defendants' vicarious liability for Fr. J.V.H.'s tortious conduct.[6] The archdiocesan

defendants' motion to dismiss should therefore be denied as to Jane's *respondeat superior* claims.

---

[5] I acknowledge that Jane's allegations in this action are close to formulaic, in that they recite the *Chesterman* factors for *respondeat superior* liability with only minimal factual support, and are less well developed than the pleadings in *Fearing* or *Lourim*. Nevertheless, in *Fearing* the Oregon Supreme Court found allegations of ultimate facts similar to those alleged here to be sufficient to survive a motion to dismiss for failure to state a claim, and I therefore so find here.

[6] The archdiocesan defendants advance the argument that *respondeat superior* liability is not cognizable as to the tort of intentional infliction of emotional distress where it is not an employee's job duty to intentionally inflict emotional distress. This argument does not modify my conclusion that Jane has pled the elements of *respondeat superior* liability as to both the sexual battery claim and the intentional infliction claim. The intentional act alleged to have inflicted severe emotional distress is the sex abuse Jane suffered at Fr. J.V.H.'s hands, and that abuse is alleged to have resulted from acts taken within the course and scope of Fr. J.V.H.'s employment.

Page 22 - FINDINGS AND RECOMMENDATION AND ORDER

## B.    Negligence

Jane alleges that all defendants – apparently including Fr. J.V.H. as well as the

archdiocesan defendants – were negligent in failing "to investigate, monitor, supervise, restrict,

or remove Fr. J.V.H. during his formation and ministry" despite having allegedly become aware

of "potential warning signs" that he might be dangerous to those entrusted to his care or

influence.  Jane alleges that the "potential warning signs" the archdiocesan defendants had reason

to be aware of created a foreseeable risk of danger to persons entrusted to Fr. J.V.H.'s care or

influence.

To state a claim for negligence under Oregon common law, a plaintiff must show that the

defendant owed the plaintiff a duty, that the duty was breached, and that the breach caused the

plaintiff harm.  *See, e.g., Fazzolari v. Portland School Dist.*, 303 Or. 1, 14-17 (1987).  In the

absence of a specific duty created, defined, or limited by a specified status, relationship or

standard of conduct, a defendant may be liable for negligence if the defendant's conduct

"unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the

plaintiff."  *Cowan v. Nordyke*, 232 Or. App. 384, 384 (Or. Ct. App. 2009).  The archdiocesan

defendants argue that a claim for negligent supervision of a priest is simply not cognizable

against a church authority under First Amendment principles requiring civil courts to defer to

ecclesiastic authority in deciding matters related to religious dogma, and in the alternative that

Jane has failed to plead ultimate facts that, if proven, would establish the existence of a special

relationship between them and Jane of a kind that would create a duty of care and/or any

foreseeable risk to Jane of the harm she actually suffered, and in the further alternative that Jane

has failed to plead ultimate facts that, if proven, would establish that Jane's injuries were caused

by the archdiocesan defendants' alleged breach of a duty of care.

As to the archdiocesan defendants' Constitutional argument, the First Amendment "requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (citations omitted). Based on this consideration, "[i]n the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 447 (1969). Courts therefore must apply neutral principles of law in deciding disputes involving ecclesiastical issues. *See id.* at 449. Here, no ecclesiastical issues are raised by Jane's claim; the same neutral principles of law would apply whether the alleged abuser were a priest or a groundskeeper, and the factors considered in determining whether a man may be ordained as a priest do not arise. The First Amendment therefore cannot bar Jane's negligence claim.

As to whether Jane has adequately pled a special relationship between herself and the archdiocesan defendants of a kind that would create a cognizable duty of care, Jane alleges and argues that "[a]s a young girl entrusted to the care and influence of the Catholic Church and Fr. J.V.H., an agent and employee of Archdiocese Defendants," she had "a special relationship with Defendants." However, under Oregon law:

> The common thread among [such] special relationships--that is, those warranting a heightened duty of care--is that "the party who owes the duty has a *special responsibility* toward the other party":
>
> > This is so because the party who is owed the duty effectively has

> authorized the party who owes the duty to exercise independent judgment
> in the former party's behalf and in the former party's interests. In doing so,
> the party who is owed the duty is placed in a position of reliance upon the
> party who owes the duty; that is, because the former has given
> responsibility and control over the situation at issue to the latter, the
> former has a right to rely upon the latter to achieve a desired outcome or
> resolution.

*Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 367 (Or. Ct. App. 2005) (emphasis

original), *quoting Conway v. Pacific Univ.*, 324 Or. 231, 239-240 (1995). Under this standard, it

is clear that the kind of "special relationship" Jane pled is not of a kind that gives rise to a

heightened duty of care. Jane does not allege that she was a parishioner of any church of the

Archdiocese. Neither Jane nor her family authorized the Archbishop or the Archdiocese to

exercise independent judgment in Jane's interests or gave the archdiocesan defendants

responsibility for or control over Jane's welfare. That is, although Jane's allegations contain the

phrase "special relationship," no ultimate facts are pled that suggest the existence of the kind of

relationship that could give rise to a duty of care. I therefore conclude that defendants are correct

to the extent they argue that Jane has not adequately pled the existence of a duty of care owed by

the archdiocesan defendants to Jane.

As to whether Jane has pled facts giving rise to a foreseeable risk to a protected interest of

the kind of harm she suffered, Jane has alleged that the archdiocesan defendants had knowledge

of specific facts that a reasonable person would have construed as creating a risk that children

entrusted to Fr. J.V.H.'s care might be unsafe. However, for purposes of the foreseeability

analysis, the issue is not solely one of the archdiocesan defendants' knowledge, but whether, in

light of that knowledge, the archdiocesan defendants' *conduct* created a foreseeable risk to a

protected interest of the kind of harm Jane suffered. Assuming without deciding that a

Page 25 - FINDINGS AND RECOMMENDATION AND ORDER

reasonable person possessed of the knowledge Jane imputes to the archdiocesan defendants would have understood that children would be unsafe with Fr. J.V.H., it would clearly have constituted actionable negligence had the archdiocesan defendants permitted Fr. J.V.H. to conduct a youth ministry, formally entrusted children to his care, or otherwise authorized him to minister to children unsupervised. Here, however, there is no allegation that the archdiocesan defendants did any of these things. Instead, the question for the court is whether the archdiocesan defendants' alleged failures to investigate or follow up on potentially troubling findings from J.V.H.'s psychological examinations, to monitor or supervise Fr. J.V.H.'s interactions with minors, to restrict Fr. J.V.H.'s interactions with children, and/or to remove Fr. J.V.H. from the ministry created an unreasonable risk of harm.

Jane has expressly alleged that the abuse she suffered resulted from "grooming" conduct that Fr. J.V.H. engaged in within the course and scope of his employment duties. Assuming the truth of Jane's allegations, some of the abuse she suffered at Fr. J.V.H.'s hands therefore would not have occurred but for J.V.H.'s status as an ordained priest of the Roman Catholic church. That is, assuming the truth of Jane's allegations, some of the abuse would not have taken place but for the archdiocesan defendants' failure to investigate, monitor, restrict, and/or defrock Fr. J.V.H.. Moreover, in light of the authority and status enjoyed by Roman Catholic priests within the Roman Catholic community, a finder of fact could reasonably conclude that failure to investigate, monitor, restrict, and/or defrock a Roman Catholic priest whose record and behavior suggested a potential sex abuse risk created a foreseeable, unreasonable risk to children entrusted to his care or permitted to come into unsupervised contact with him.

Because the record does not foreclose the possibility that the archdiocesan defendants'

Page 26 - FINDINGS AND RECOMMENDATION AND ORDER

conduct could give rise to liability for negligence, motion to dismiss should be denied as to Jane's
negligence claim.

### C.    Misrepresentation

As noted above, Jane has represented to the court that she will voluntarily withdraw her
misrepresentation claim.  In consequence of Jane's assertion, the misrepresentation claim should
be dismissed without prejudice.  *See* Fed. R. Civ. P. 41(a)(1).  The archdiocesan defendants'
motion to dismiss should therefore be denied as moot as to the misrepresentation claim.

### D.    Punitive Damages

Jane asserts a right to punitive damages from the archdiocesan defendants, premised on
her claim for negligence.  Under Oregon law, "[p]unitive damages are not recoverable in a civil
action unless it is proven by clear and convincing evidence that the party against whom punitive
damages are sought has acted with malice or has shown a reckless and outrageous indifference to
a highly unreasonable risk of harm and has acted with a conscious indifference to the health,
safety and welfare of others."  O.R.S. 31.730(1).

Although it is clear under Oregon law that simple negligence, without more, cannot
support an award of punitive damages, *see* O.R.S. 31.730(1), where the evidentiary record
supports findings of *both* negligence *and* the additional factors of aggravated misconduct
requisite for award of punitive damages, a punitive damages award may lie in connection with a
negligence claim, *see Georgetown Realty v. Home Ins. Co.*, 113 Or. App. 641, 644-645 (Or. Ct.
App. 1992), *quoting Boger v. Norris & Stevens, Inc.*, 109 Or. App. 90, 94-95 (1991), *citing
Wilson v. Tobiassen*, 97 Or. App. 527 (1989).

Oregon Supreme Court jurisprudence recognizes that no single formulation of the legal

Page 27 - FINDINGS AND RECOMMENDATION AND ORDER

standard for award of punitive damages could apply to the entire range of cases in which punitive

damages may be appropriate:

> The defendant's culpability may range from a deliberate purpose to cause harm to
> the plaintiff or to others regardless of gaining any benefit thereby, through an
> intent to harm the plaintiff or others in order to benefit oneself, and a readiness to
> benefit oneself with conscious indifference to or disregard of a known or highly
> probable risk of severe harm to others to a readiness to expose others to such risks
> without intending any countervailing benefit to anyone. The defendant may be an
> individual or it may be an enterprise or other organization, which poses the
> question where the culpable mental state is to be located. The conduct at issue
> may be a single act, or it may be repeated, or continuous, or a failure to act. The
> interests culpably invaded or disregarded ordinarily are personal to the plaintiff,
> but occasionally punitive damages are imposed for breach of a public
> responsibility. The aim of punitive damages, as of punishment in other contexts,
> may be to deter the defendant, or to deter others, or to reaffirm and vindicate
> social norms for their own sake even when the efficacy of deterrence is doubtful.

*Andor v. United Air Lines, Inc.*, 303 Or. 505, 510-511 (1987) (footnoted citations omitted). The

*Andor* court noted, further, that the legal standard for award of punitive damages may properly be

tailored to the particular "type" of defendant at issue in any given case:

> at least three types of defendants stand out as possibly deserving separate
> treatment: (1) individual defendants; (2) professional defendants; and (3)
> institutional defendants. The kinds and amounts of power a person holds over the
> welfare of another will vary among these types of defendants, as will the social
> expectations as to how the power should be controlled by each person. Surely the
> forms of power and motivations of a drunk driver are different in substantial
> measure from those of a malpracticing doctor, or stock broker, and are different in
> turn from misconduct by a power company or an automotive manufacturer.

*Id.* at 512, n. 8, *quoting* Owen, *Civil Punishment and the Public Good*, 56 S. Cal. L. Rev. 103,

105 (1982). Where, as here, the defendant is an institution or enterprise, "punitive damages serve

the function to deter enterprises from accepting the risks of harming other private or public

interests. . . ." *Id.* at 514, *quoting Schmidt v. Pine Tree Land Dev.*, 291 Or. 462, 466 (1981). The

decisions of such institutional defendants "may well be wholly impersonal with respect to any

victim, indeed conducted with the hope that no harm will occur, and they may not involve a culpable attitude on the part of any one person responsible for the management of the enterprise; yet this court has held that such lack of managerial culpability alone does not foreclose punitive damages." *Id.*, *quoting Schmidt*, 291 Or. at 466.

Moreover, under Oregon law "[i]t is well-established that whether a defendant's conduct is aggravated or wanton or comes within any of the other characterizations that permit the imposition of punitive damages is for the jury to decide, as long as there is evidence upon which the finding can be based." *Id.* at 509; *see also, e.g.*, *Webster v. Dieringer's Variety, Inc.*, 84 Or. App. 519, 524 (Or. Ct. App. 1987); *Friendship Auto v. Bank of Willamette Valley*, 300 Or. 522, 535-537 (1986); *State ex rel. Young v. Crookham*, 290 Or. 61, 71 (1980).

Here, it does not appear overwhelmingly likely that Jane will ultimately sustain her evidentiary burden to establish the archdiocesan defendants' "malice or. . . reckless and outrageous indifference to a highly unreasonable risk of harm and . . . conscious indifference to the health, safety and welfare of others," but neither do her allegations foreclose the possibility that she will do so. Indeed, she has expressly alleged that, in failing to investigate, monitor, supervise, restrict, or remove Fr. J.V.H. despite their knowledge of facts suggesting that he presented a risk to children, the archdiocesan defendants "acted with malice or a reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of [Jane]."

Jane has met her burden to plead an evidentiary basis for her prayer for punitive damages at this stage of these proceedings. Because a reasonable finder of fact could conclude on the basis of the Jane's allegations that the archdiocesan defendants' conduct met the appropriate

standard for award of punitive damages, the motion to dismiss should be denied as to Jane's
punitive damages request.

## III.    Motion to Compel

Jane moves to compel production of documents responsive to her Request for Production
No. 23. While these documents – all demand letters, responses thereto, and civil complaints
regarding child sexual abuse claims made against the Archdiocese of Portland from 1975 to 2004
– were likely of significant relevance to Jane's voluntarily withdrawn misrepresentation claim,
they are not of clear relevance to her remaining claims. The archdiocesan defendants' notice of
prior claims of sexual abuse by priests other than Fr. J.V.H. is without bearing on whether any
defendant's liability for sexual battery or for intentional infliction of emotional distress or on
whether the archdiocesan defendants were actionably negligent in their supervision or retention
of Fr. J.V.H. This holds true in particular where, as here, it is undisputed that the archdiocesan
defendants were aware at all material times that numerous complaints of sexual abuse by priests
of the Archdiocese had been filed over the decades preceding Fr. J.V.H.'s ordination.

Because the requested discovery is neither relevant to Jane's remaining claims nor
reasonably calculated to lead to the production of admissible evidence, Jane's motion to compel
should be denied.

## CONCLUSION

For the reasons set forth above,  I recommend that Jane's motion (#44) to compel
production of documents be denied, that Jane's claim of misrepresentation be dismissed without
prejudice, that the archdiocesan defendants' motion (#52) to dismiss be denied as moot as to
Jane's misrepresentation claim and otherwise denied, and that the archdiocesan defendants'

motion (#54) for judicial notice be granted in part and denied in part as discussed above.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 8th day of April, 2010.

Honorable Paul Papak
United States Magistrate Judge