FILED

OCT 1 2 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANE DOE 130,

          Plaintiff,

v.

THE ARCHDIOCESE OF PORTLAND
IN OREGON, THE ROMAN CATHOLIC
ARCHBISHOP OF PORTLAND IN
OREGON, and J.V.H.,

          Defendants.

CV 08-193-PK

OPINION AND
ORDER

PAPAK, Magistrate Judge:

Fictitiously-named plaintiff Jane Doe 130 ("Jane") filed this action against defendants

The Archdiocese of Portland in Oregon (the "Archdiocese"), The Roman Catholic Archbishop of

Portland in Oregon (the "Archbishop" and, collectively with the Archdiocese, the "archdiocesan

Page 1 - OPINION AND ORDER

defendants"), and Father J. V. H. on February 14, 2008, alleging defendants' vicarious liability for sexual battery of a child and for intentional infliction of emotional distress on a theory of *respondeat superior*, and direct liability for common-law negligence and fraud. On November 19, 2009, Jane amended her complaint to allege defendants' vicarious liability for sexual battery of a child prior to July 6, 2004,[1] sexual battery of a child following July 6, 2004, intentional infliction of emotional distress prior to July 6, 2004, and intentional infliction of emotional distress following July 6, 2004, on a theory of *respondeat superior*, and direct liability for negligence and for misrepresentation. On April 8, 2010, I recommended dismissal of Jane's misrepresentation claim, and on May 4, 2010, Judge Mosman adopted that recommendation. This court has jurisdiction over Jane's action pursuant to 28 U.S.C. § 1334(b), based on the relatedness of these proceedings to a case arising under Title 11 of the United States Code.[2]

Now before the court are Jane's motion (#85) for leave to amend her complaint and the archdiocesan defendants' motion (#89) for a protective order. I have considered the motions, all of the pleadings on file, and oral argument on behalf of the parties. For the reasons that follow, Jane's motion for leave to amend is granted in part and denied in part as set forth below, and the archdiocesan defendants' motion for protective order is denied.

---

[1] Claims arising prior to July 6, 2004, are to be paid out of the future claims fund, and are subject to the cap on the total amount to be paid toward such claims *see infra*, whereas claims arising on or after July 6, 2004, constitute administrative claims against the archdiocesan defendants outside the scope of the future claims fund.

[2] Specifically, this action is subject to the future claims fund under the Third Amended and Restated Joint Plan of Reorganization confirmed in *In re Roman Catholic Archbishop of Portland*, 04-37154, which, in relevant part, sets a $20 million cap on the total funds available to pay all claims made against the Archdiocese through 2023.

## LEGAL STANDARDS

### I.    Leave to Amend

After a defendant has filed a response to an initially-filed complaint, "a party may amend

its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P.

15(a)(2).  Federal Civil Procedure Rule 15 specifies that "[t]he court should freely give leave

when justice so requires." *Id.*  The Ninth Circuit has specified that Rule 15 is to be interpreted

with "extreme liberality," *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990), *citing*

*United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981), although leave to amend is

nevertheless "not to be granted automatically," *id.*  The district court's discretion to deny a motion

for leave to amend is particularly broad where (as here) the court has already given the plaintiff

one or more opportunities to amend her complaint.  *See, e.g., Mir v. Fosburg*, 646 F.2d 342, 347

(9th Cir. 1980).

### II.    Protective Order

"A party . . . from whom discovery is sought may move for a protective order in the court

where the action is pending. . . ." Fed. R. Civ. P. 26(c)(1).  Rule 26(c) provides that a court may

for "good cause" issue such a protective order "to protect a party or person from annoyance,

embarrassment, oppression, or undue burden or expense," including an order:

> (A) forbidding the disclosure or discovery;
>
> (B) specifying terms, including time and place, for the disclosure or discovery;
>
> * * * [or]
>
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or
> discovery to certain matters. . . .

*Id.* To obtain such a protective order, the party resisting discovery or seeking limitations must show "good cause" for its issuance by demonstrating harm or prejudice that will result from the discovery. Fed. R. Civ. P. 26(c)(1); *see also Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1210-1211 (9th Cir. 2002).

**FACTUAL BACKGROUND**

Jane is a minor female born in 1991. Between August of 1993 and June of 1999, J.V.H. was a seminarian at Mt. Angel Seminary in Oregon, an educational institution within the authority of the archdiocesan defendants. Between June 1999 and 2007, Fr. J.V.H. was a Catholic priest directly employed by the archdiocesan defendants. Jane alleges that Fr. J.V.H. provided pastoral and educational services to her in his capacity as a priest,[3] in connection with which he acted within the course and scope of his employment by the archdiocesan defendants.

**I.      History of the Parties' Dispute**

Jane testified in deposition that J.V.H. first began touching her sexually when she was approximately 6 or 7 years old, in or around 1997. At that time, Jane lived in Virginia, and J.V.H. was a seminary student in Mt. Angel, Oregon. The initial sexual touching took place in Virginia, in Jane's grandmother's home.

J.V.H. was ordained as a priest of the Archdiocese in June 1999. Jane moved to Portland, Oregon, in 2004, when she was approximately 14. It appears that Fr. J.V.H. continued abusing Jane from approximately 1997 through some time in 2004, after Jane's family moved to Oregon.

Neither Jane nor her parents have ever been members of a parish to which Fr. J.V.H. was

---

[3] Although the parties have asserted in other contexts that J.V.H. is Jane's paternal uncle, Jane's blood relationship to J.V.H. is not alleged in the complaint.

assigned.  The Archdiocese has not received any complaints of sexual misconduct by Fr. J.V.H.

other than in connection with this action.

## II.    Allegations of Jane's Current Complaint

Jane alleges that:

> For the purpose of furthering his duties as a priest, Fr. J.V.H. sought and gained
> the trust, admiration, and obedience of the Plaintiff in this case.  Plaintiff was also
> conditioned by her church, school and family to respect and obey priests,
> including Fr. J.V.H..  As a result, Plaintiff was conditioned to trust Fr. J.V.H., to
> comply with Fr. J.V.H.'s direction, and to respect Fr. J.V.H. as a person of
> authority in spiritual, moral and ethical matters.

Amended Complaint, ¶ 6.[4]  In her complaint, Jane refers to this process as one of "Grooming."

She alleges that:

> The Grooming process led to Fr. J.V.H.'s acts of sexual molestation of the
> Plaintiff. . . .  Fr. J.V.H.'s Grooming of Plaintiff was (1) committed in direct
> connection [*sic*] and for the purposes of fulfilling his employment and agency
> with Archdiocese Defendants; (2) committed within the time and space limits of
> his agency and employment; (3) done initially and at least in part from a desire to
> serve the interests of the Archdiocese Defendants; (4) done directly in the
> performance of his duties; (5) generally consisted of actions the kind and nature of
> which Fr. J.V.H. was required to perform; and (6) was done at the direction of,
> and pursuant to, the power vested in him by the Archdiocese Defendants.

*Id.*, ¶ 7.  Jane further alleges that Fr. J.V.H., "while acting within the course and scope of his

employment and agency, and using the authority and position of trust as a priest for the

Archdiocese Defendants—through the Grooming process—induced and directed Plaintiff to

engage in sexual contact with Fr. J.V.H. both prior to and after July 6, 2004." *Id.*, ¶ 8.  She

alleges that this sexual abuse continued for approximately six years, from a time when she was

---

[4] Although Jane's current pleading is captioned as her "Second Amended Complaint," it
is in fact her first amended complaint.  "Amended Complaint" hereinafter refers to Jane's current
pleading, filed November 19, 2009.

Page 5 - OPINION AND ORDER

approximately eight years old to a time when she was approximately 14. *See id.*, ¶ 9.

In connection with Jane's claims against the archdiocesan defendants for sexual battery of a child and for intentional infliction of emotional distress, each alleged on a theory of *respondeat superior*, Jane alleges that "Fr. J.V.H. used the Grooming process to accomplish his sexual battery of Plaintiff," *id.*, ¶¶ 15, 19, and that "Fr. J.V.H. used the Grooming process to intentionally inflict severe emotional distress by his acts of sexual molestation of the Plaintiff," *id.*, ¶¶ 23, 27.

In connection with Jane's claim for negligence, alleged on a theory of direct liability, Jane alleges as follows. First, she alleges that the archdiocesan defendants owed her a special duty of care:

> As a young girl entrusted to the care and influence of the Catholic Church and Fr. J.V.H., an agent and employee of Archdiocese Defendants, Plaintiff has a special relationship with Defendants. This special relationship created a requirement that Archdiocese Defendants act with care to ensure Plaintiff's safety while interacting with Archdiocese Defendants' agents and employees.

*Id.*, ¶ 30. Second, she alleges that the archdiocesan defendants had notice that Fr. J.V.H. posed a threat to children by not later than August 1993:

> By approximately August of 1993, prior to final acceptance of Fr. J.V.H. as a priest, Archdiocese Defendants became aware that Fr. J.V.H. posed an emotional, physical or sexual danger to those in his care and influence. Specifically, Archdiocese Defendant had knowledge of the following facts:
>
> A.    Archdiocese Defendants knew that Fr. J.V.H. had left the Holy Cross Fathers, and knew or should have known that a part of the reason for his leaving was the resistance Fr. J.V.H. received from the Holy Cross Fathers in response to his quest towards becoming a priest.
>
> B.    Archdiocese Defendants knew from Fr. J.V.H.'s screening psychological examinations that evaluators had concerns about

whether he was being truthful and accurate with them in relation to his sexuality.

C.     Archdiocese Defendants knew from Fr. J.V.H.'s screening psychological examinations that Fr. J.V.H. had reported to evaluators that he was concerned that psychological testing might indicate he was a child molester.

D.     Archdiocese Defendants knew from Fr. J.V.H.'s psychological examinations that evaluators recommended that the Archdiocese Defendants' formation team closely monitor him regarding sexual matters.

Prior to the last of the abuse suffered by Plaintiff, Archdiocese Defendants knew or should have known that Fr. J.V.H. was repeatedly ineffective in his assignments for reasons centering around lack of energy or initiative. This knowledge might have been unremarkable in isolation, but taken in conjunction with the factors listed in subparagraphs A - D, above, should have indicated to Archdiocese Defendants that Fr. J.V.H. was emotionally unwell, that his celibacy was at risk, and that children in his care might be unsafe.

*Id.*, ¶ 31.  Third, she alleges that the archdiocesan defendants were actionably negligent in the following ways:

A.     Failing to investigate or otherwise follow up on findings in Fr. J.V.H.'s psychological examinations that indicated that evaluators had concerns about the accuracy of Fr. J.V.H.'s reporting regarding his sexuality.

B.     Failing to investigate or otherwise follow up on findings in Fr. J.V.H.'s psychological examinations that indicated that Fr. J.V.H. had concerns that the results of the examinations would indicate that he was a child molester.

C.     Failing to supervise, monitor, or otherwise follow the recommendation of professional psychologists that Fr. J.V.H. be watched closely, including failing to watch, supervise and monitor Fr. J.V.H. closely throughout his formation, particularly in relation to his interactions with minors.

D.     Failing to either remove Fr. J.V.H. from ministry or to restrict or monitor his interactions with those under his care and influence.

*Id.*, ¶ 32.  Fourth, she alleges that:

Page 7 - OPINION AND ORDER

> Archdiocese Defendants' failure to investigate, monitor, supervise, restrict, or remove Fr. J.V.H. during his formation and ministry, despite having received notice of his danger to those under his care and influence, created a foreseeable risk of harm to the safety of those in his care and influence, including Plaintiff in this case. Plaintiff's interest in being free from sexual and physical abuse is an interest of a kind that the law protects against negligent invasion. Archdiocese Defendants' failure to investigate, monitor, supervise, restrict, or remove Fr. J.V.H. once Archdiocese Defendants knew of his danger to those under his care and influence was unreasonable in light of the risk posed to children in his charge. Archdiocese Defendants' failure to investigate, monitor, supervise, or remove Fr. J.V.H. was a cause of the abuse and molestation suffered by Plaintiff . . . . Finally, as a child who was sexually and physically assaulted, Plaintiff was within the class of persons and Plaintiff's injury was within the general type of potential incidents and injuries that made Archdiocese Defendants' conduct negligent.

*Id.*, ¶ 33.

In connection with her claim of entitlement to punitive damages, Jane alleges as follows:

> In their negligence toward the rights and safety of Plaintiff, Archdiocese Defendants acted with malice or a reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety and welfare of Plaintiff. Plaintiff is therefore entitled to punitive damages against Archdiocese Defendants in the amount of $10,000,000.00.

*Id.*, ¶ 35.

In addition to the foregoing allegations, Jane's current pleading contains allegations in support of her already-dismissed claim of misrepresentation. *See id.*, ¶¶ 37-45.

### III.   Allegations of Jane's Proposed New Pleading

In connection with her motion for leave to amend, Jane proposes a variety of modifications to her pleading. First, she proposes to eliminate her already-dismissed misrepresentation claim from her pleading. Second, she proposes to amend her existing negligence claim, in connection with which she alleges that the archdiocesan defendants were negligent in the supervision of Fr. J.V.H., so that it is pled only against the archdiocesan

defendants and not also against Fr. J.V.H. The defendants do not oppose these proposed amendments.

Third, in connection with her allegations of underlying fact, Jane proposes to amend her pleading to eliminate allegations that the archdiocesan defendants "empowered" Fr. J.V.H. to perform the duties of a priest and to add the allegation that the archdiocesan defendants "authorized or ratified" Fr. J.V.H.'s activities in performing religious functions within private homes outside the geographical boundaries of the Archdiocese. *Id.*, ¶ 5; *see also* Amended Complaint, ¶ 5. She further proposes to add new allegations as follows:

> Alternatively or in conjunction with the Grooming activity described [in Jane's Amended Complaint, ¶ 6], Fr. J.V.H. also ministered to Plaintiff and family in her grandmother's home and other family residences, said mass, performed sacraments with her, and engaged in other priestly activities with Plaintiff.

Proposed Second Amended Complaint, ¶ 7. She further proposes to add an allegation to specify that Fr. J.V.H. acted as Jane's priest when he induced her to engage in sexual conduct with him. *See id.*, ¶ 9. The defendants do not appear to oppose these amendments, which are apparently intended to conform Jane's pleadings to the evidence.[5]

Fourth, Jane proposes to add a new claim for negligence, which she characterizes as a claim for "institution-wide" negligence. The proposed allegations in support of the new claim are as follows:

> For at least 40 years prior to Fr. JVH applying for admission to the Archdiocese of Portland, the Archdiocese had experienced consistent and substantial occurrences of child sexual abuse by priests of the Archdiocese. As a result of this experience, the Archdiocese knew that it had an institution-wide problem with priests abusing children[.]

_____

[5] In addition, Jane proposes a small number of technical amendments to the language of the allegations of underlying fact as to which the defendants raise no objection.

Page 9 - OPINION AND ORDER

Archdiocese Defendants created a special relationship with Plaintiff when they invited her to participate in religious and spiritual relationships with their priests. That relationship created a duty on the part of Archdiocese Defendants to ensure that the priesthood was made as reasonably safe as possible from known dangers. Alternatively Archdiocese Defendants created a dangerous situation because it knew that the priesthood was being used by a significant number of predatory child molesters to victimize children, and knew that the Archdiocese of Portland had an institution-wide child abuse problem because of those priests. Despite the knowledge of the Archdiocese as set forth in paragraph 38 above, the Archdiocese failed to take steps address the problem, to improve its screening and monitoring programs for potential priests, and otherwise failed to take reasonable steps to protect children. . . .

Despite the knowledge of the Archdiocese as set forth in [the second preceding] paragraph . . . , the Archdiocese failed to take steps to address the problem of sexually abusive priests, failed to improve its screening and monitoring programs for potential priests, and otherwise failed to take reasonable steps to protect children. Through this failure, Archdiocese Defendants created a foreseeable danger to Plaintiff by inviting her to associate with, trust, and obey their priests. The abuse was foreseeable to Archdiocese Defendants because of the knowledge of decades of abuse by the Archdiocese's priests. Furthermore, the Archdiocese knew from early in his formation process that Fr. J.V.H. posed a high risk of sexual misconduct, but allowed him to become a seminarian and priest in the Archdiocese, thereby increasing his access to and influence over the Plaintiff, all contributing to the abuse.

Archdiocese Defendants' institutional negligence was a substantial contributing and causal factor to the abuse of Plaintiff. Plaintiff was a member of the class of individuals to be protected by adequate screening policies, and adequate screening would have protected Plaintiff from some or all of her abuse, because her family would not have allowed Fr. J.V.H. to spend extended periods of time alone with her had he not been a seminarian and later a priest of the Archdiocese.

As a direct and foreseeable consequence of the failures of the Archdiocese as set forth in [the four preceding] paragraphs . . . , Plaintiff has suffered damages . . . .

In its negligence toward the rights and safety of Plaintiff, the Archdiocese acted with malice or a reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety and welfare of Plaintiff. Plaintiff is therefore entitled to punitive damages against Archdiocese Defendants in the amount of $10,000,000.00.

Proposed Second Amended Complaint, ¶¶ 38-43. Thus, the gravamen of the proposed new claim

is that – by contrast with the existing claim of negligence, which is premised on the theory that the archdiocesan defendants' specific actual knowledge of Fr. J.V.H. made it foreseeable to them that he would pose a risk of sex abuse to minors, creating a duty for the archdiocesan defendants to take steps to protect minors from Fr. J.V.H. in particular – the archdiocesan defendants' knowledge of its institution-wide problem of pedophile priests in general made it foreseeable to them that minors entrusted to their care could be harmed by a pedophile priest, creating a duty to take steps to protect minors from pedophile priests in general, which steps would, if effected, have prevented the harm that Jane suffered at the hands of Fr. J.V.H.  The archdiocesan defendants oppose these proposed amendments.

Fifth, in connection with her existing negligence claim, Jane proposes to amend her pleading by replacing paragraph 30 of her current pleading, quoted above (regarding the alleged "special relationship" between Jane and the defendants), with the following:

> Archdiocese Defendants created a special relationship with Plaintiff when they invited her to participate in religious and spiritual relationships with their priests. That relationship created a duty on the part of Archdiocese Defendants to ensure that the priesthood was made as reasonably safe as possible from known dangers. Alternatively Archdiocese Defendants created a dangerous situation when it allowed Fr. J.V.H. into the seminary and subsequently when it ordained Fr. J.V.H. to the priesthood, despite its knowledge of his background.

*Id.*, ¶ 31.  The archdiocesan defendants oppose this amendment.[6]

Sixth, in connection with her four claims premised in part on a theory of *respondeat superior,* Jane proposes to amend her pleading to specify that Fr. J.V.H. used "his role as priest to Plaintiff" in conjunction with or in the alternative to the Grooming process in order to

---

[6] In addition, Jane proposes a small number of technical amendments to the language of the allegations in support of the existing negligence claim as to which the defendants raise no objection.

Page 11 - OPINION AND ORDER

accomplish his alleged sexual battery of Jane and his alleged intentional infliction of emotional distress. *See id.*, ¶¶ 16, 20, 24, 28. The archdiocesan defendants oppose these amendments. Jane further proposes, in connection with her two *respondeat superior* claims for sexual battery of a child, to amend her pleading to specify that she did not consent and, as a minor, could not as a matter of law have consented to the alleged sexual touching. *See id.*, ¶¶ 15, 19. It does not appear that the archdiocesan defendants oppose these latter amendments.

## ANALYSIS

### I.    Motion for Leave to Amend

A motion for leave to amend should be granted unless there has been a showing that to permit the amendment would produce an undue delay in the litigation, that the motion was brought in bad faith or out of dilatory motive, that the movant has repeatedly failed to cure deficiencies in the complaint by previous amendments, that the proposed amendment would unduly prejudice an opposing party, or that the proposed amendment would result in futility for lack of merit. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Moreover, it is well settled that, of these factors, the most important is the potential for prejudice to opposing parties, *see Jackson*, 902 F.2d at 1387, *citing Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971), that futility alone is sufficient grounds for denying a motion to amend, *see Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004), *quoting Nunes v. Ashcroft*, 348 F.3d 815, 818 (9th Cir. 2003), and that undue delay alone is insufficient to justify the denial of a motion for leave to amend, *see Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999). The Ninth Circuit has held that "a district court does not abuse its discretion in denying a motion to amend where the movant presents no new facts but only new theories and provides no satisfactory explanation for his

Page 12 - OPINION AND ORDER

failure to fully develop his contentions originally." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir.

1995), *citing Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990). The district courts

have authority to grant a motion for leave to amend only in part where the factors justifying

denial apply only to some and not to all of the proposed amendments. *See, e.g., Wagner v.

Posner*, Case No. 09-CV-3166 FCD KJN P, 2010 U.S. Dist. LEXIS 95062 (E.D. Cal. August 26,

2010); *Vieste, LLC v. Hill Redwood Dev.*, case No. C 09-04024 JSW, 2010 U.S. Dist. LEXIS

92387 (N.D. Cal. August 11, 2010); *Hildes v. Andersen*, Case No. 08-CV-8-BEN, 2010 U.S.

Dist. LEXIS 72086, 28-29 (S.D. Cal. July 19, 2010).

For the following reasons, Jane's motion for leave to amend is granted in part and denied

in part. Specifically, the motion is denied as to the proposed amendments to add a new claim for

institution-wide negligence, and otherwise granted.

### A.    Proposed Amendments to Eliminate Misrepresentation Claim, to Plead Existing Negligence Claim Against Archdiocesan Defendants Only, to Specify that Jane Did Not Consent to Fr. J.V.H.'s Alleged Sexual Battery, and to Modify Underlying Factual Allegations to Conform to the Evidence

As noted above, Jane proposes to amend her pleading to eliminate her already-dismissed

misrepresentation claim, to plead her existing negligence claim against the archdiocesan

defendants only, and not also, illogically, against Fr. J.V.H, to specify that she did not consent

and could not have consented to Fr, J.V.H.'s sexual battery, and otherwise to conform her

underlying factual allegations to the evidence. The defendants do not oppose these amendments,

and there appear to be no grounds for supposing that these amendments could cause prejudice to

any party, would result in futility, were proposed in bad faith or for dilatory motive, or might

unduly delay these proceedings. The motion for leave to amend is therefore granted as to these

unopposed amendments.

**B.    Proposed Amendments to Add New Claim for "Institution-Wide" Negligence**

Jane's primary argument in favor of leave to amend to add her proposed "institution-wide" negligence claim appears to be that leave should be granted because Oregon law has recently changed materially with respect to the law governing such claims. In support, Jane asserts that an April 2010 jury verdict in Multnomah County Circuit Court case *Jack Doe 1* et al. *v. Corporation of the Presiding Bishop* et al., Case No. 0710-11294, established the viability of the institution-wide negligence theory. However, Jane provides a copy of neither the jury verdict itself nor the *Jack Doe 1* complaint, and does not suggest any mechanism by which a jury verdict could create a novel proposition of Oregon law. I am therefore unmoved by Jane's arguments to the extent premised on the *Jack Doe 1* jury verdict.

Nevertheless, I am satisfied that the proposed amendments, if permitted, would be sufficient to state a claim for negligence under Oregon law. That is, I do not see any grounds for construing the proposed new claim as premised on any novel theory of negligence or indeed as being in any way formally distinguishable from a traditional negligence claim. To state a traditional claim for negligence under Oregon common law, a plaintiff must show that the defendant owed the plaintiff a duty, that the duty was breached, and that the breach caused the plaintiff harm. *See, e.g., Fazzolari v. Portland School Dist.*, 303 Or. 1, 14-17 (1987). In the absence of a specific duty created, defined, or limited by a specified status, relationship or standard of conduct, a defendant may be liable for negligence if the defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Cowan v. Nordyke*, 232 Or. App. 384, 384 (Or. Ct. App. 2009).

The proposed new negligence claim differs from the already pending negligence claim, not in its legal underpinnings, but in the conduct alleged to have been negligent and in the knowledge alleged to have given rise to a foreseeable risk of harm to a protected interest of the kind that Jane suffered. That is, whereas the existing claim alleges the archdiocesan defendants' liability for negligently failing to "investigate, monitor, supervise, restrict, or remove Fr. J.V.H. during his formation and ministry," based on the theory that such conduct created a foreseeable risk that Fr. J.V.H. would use his priestly status to accomplish the sexual abuse of a minor, that risk being foreseeable in light of the archdiocesan defendants' knowledge of specified facts about Fr. J.V.H., the proposed new claim alleges the archdiocesan defendants' liability for negligently failing to "take steps to address the problem of sexually abusive priests, . . . improve its screening and monitoring programs for potential priests, and otherwise . . . take reasonable steps to protect children," based on the theory that such conduct created a foreseeable risk that a sexually abusive priest employed by the Archdiocese would use his priestly status to accomplish the sexual abuse of a minor, that risk being foreseeable in light of the archdiocesan defendants' knowledge of their "institution-wide problem with" pedophile priests.

Because the proposed allegations would support a viable negligence claim under Oregon law, and because the proposed new claim differs significantly in its factual underpinnings from the existing negligence claim, I conclude that grounds do not exist for denying the motion in connection with the proposed new negligence claim on the basis of futility.

The archdiocesan defendants argue that they would be prejudiced if Jane were permitted to amend her complaint to add the proposed new institution-wide negligence claim, in that the new claim would necessitate new and additional discovery. Although discovery has not yet closed,

and indeed is not scheduled to close until 45 days after "the pleadings are settled," *see* Docket No. 75, the archdiocesan defendants' assertion of prejudice is nevertheless colorable: this case has been progressing for two and one half years, and Jane has unsuccessfully been seeking precisely the sort of broad discovery the new claim would open the door from the beginning of these proceedings. To permit such discovery now would effectively require the archdiocesan defendants to redevelop their litigation strategy anew at an advanced stage of this litigation.

Moreover, even if requiring the archdiocesan defendants to engage in extremely broad new discovery after two and one half years of litigation were not deemed prejudicial for purposes of Rule 15, it would be inappropriate to grant leave to amend here. The facts Jane alleges in support of the new claim are not new, but rather have formed a part of the basis of her existing claims since they were first filed. To the contrary, the proposed new claim essentially constitutes a new theory of the archdiocesan defendants' liability arising out of facts of which Jane and her counsel have had actual knowledge throughout these proceedings. The only explanation Jane offers, even tacitly, to explain why she is only now raising her new theory of negligence, more than two and a half years into this litigation, is her contention that the Oregon courts would not have recognized the theory prior to the *Jack Doe I* jury verdict. Because, as discussed above, the theory of negligence underlying the proposed new claim does not require any extension of Oregon's traditional negligence law to support a viable claim, and because in any event the jury verdict cannot have effected any such extension, the verdict in *Jack Doe I* is necessarily inadequate to explain Jane's failure to present her theory earlier in these proceedings. Because Jane has failed to meet her burden to provide a satisfactory explanation for why the new claim could not have been raised earlier, the motion for leave to amend is denied as to the amendments to allege a new claim

Page 16 - OPINION AND ORDER

for institution-wide negligence. *See Bonin*, 59 F.3d at 845; *Allen*, 911 F.2d at 374.[7]

### C.    Proposed Amendment to Modify "Special Relationship" Allegations

As noted above, Jane proposes to amend her pleading to clarify and modify her allegations regarding her supposed "special" relationship with the defendants. In my Findings and Recommendation (#82) dated April 8, 2010, adopted as Judge Mosman's own Opinion and Order (#84) on May 4, 2010, I found that Jane's existing negligence claim could not survive the archdiocesan defendants' motion to dismiss on the theory that the defendants violated a duty of care arising out of any special relationship, but found instead that it stated a viable claim for negligence on a theory of foreseeability. In consequence, the allegations regarding a "special relationship" are effectively immaterial, constituting background information rather than essential elements of the claim. It therefore appears that permitting the amendment would not prejudice any party, result in futility, or unduly delay these proceedings. Moreover, there is no suggestion that the amendment was proposed in bad faith or for dilatory motive. The motion for leave to amend is therefore granted in connection with this proposed amendment.

### D.    Proposed Amendments to *Respondeat Superior* Claims

As noted above, Jane proposes to amend her pleading to specify that Fr. J.V.H. used "his role as priest to Plaintiff" in order to accomplish his alleged sexual battery of Jane and his alleged intentional infliction of emotional distress. There appear to be no grounds for concluding that permitting the proposed amendments would prejudice any party, were proposed in bad faith or for dilatory motive, or might unduly delay these proceedings. However, defendants argue that the

---

[7] I note, further, that Jane has already had opportunity to amend her complaint on one prior occasion, and failed to raise the proposed new claim at that time. Her failure to do so affords me increased discretion to deny her motion for leave to amend. *See Mir*, 646 F.2d at 347.

amendments would be futile under Oregon's vicarious liability law.

Jane argues that recent changes to Oregon law support the proposed amendments, citing to *Schmidt v. Archdiocese of Portland* ("*Schmidt III*"), 235 Or. App. 516 (2010).  Analysis of the changes, if any, effected by *Schmidt III*, necessarily begins with *Chesterman v. Barmon*, 305 Or. 439 (1988).  *Chesterman* set forth the basic framework for determining *respondeat superior* liability under Oregon law:

> Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts when the employee acts within the scope of employment.  Negligence or other tortious conduct by the employer is not required.  . . .
>
> Three requirements must be met to conclude that an employee was acting within the scope of employment.  These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform.

*Chesterman*, 305 Or. at 442 (citations omitted).

The *Chesterman* court specified, however, that where there is a "'time-lag' between the act allegedly producing the harm and the resulting harm," it is inappropriate to analyze the applicability of the *respondeat superior* doctrine "as of the time that the injury occurred."  *Id.* at 444.  Under that circumstance, the court ruled, "[t]he focus should be on the *act* on which vicarious liability is based and not on when the act results in *injury*."  *Id.* (emphasis original).  Applying that principle, the court found that an employer could be vicariously liable for its employee's acts where the employee ingested a hallucinogenic drug allegedly for the purpose of maintaining focus at work and then later, outside the workplace and outside the scope of his employment – but still under the influence of the drug and, allegedly, in consequence of the drug's

Page 18 - OPINION AND ORDER

effects – entered a woman's home and sexually assaulted her. *See id.* at 443-444.

Eleven years later, in a case (like the one now before the court) involving sexual assault allegedly committed by an employee of the Archdiocese, the Oregon Supreme Court had occasion to clarify the *Chesterman* ruling. Noting that "an employee's intentional tort rarely, if ever, will have been authorized expressly by the employer," the court in *Fearing v. Bucher*, 328 Or. 367 (1999), acknowledged that the employee's "sexual assaults . . . clearly were outside the scope of his employment," but held that "the [vicarious liability] inquiry does not end there." *Fearing v. Bucher*, 328 Or. 367, 374, 374 n. 4 (1999). Instead, the court held, "[t]he Archdiocese still could be found vicariously liable, if acts that were within [the employee]'s  scope of employment *resulted in* the acts which led to injury to plaintiff." *Id.* (citation, internal quotation marks omitted; emphasis supplied). That is, "where . . . the employer's vicarious liability arises out of the employee's commission of an intentional tort, [the court] must consider whether . . . allegations contained in the . . . complaint state ultimate facts sufficient to establish that acts that were within [the employee]'s scope of employment resulted in the acts that caused injury to plaintiff." *Id.*

The *Fearing* court recited the material allegations of the plaintiff's complaint as follows:

> The complaint alleges that [the employee priest] used his position as youth pastor, spiritual guide, confessor, and priest to plaintiff and his family to gain their trust and confidence, and thereby to gain the permission of plaintiff's family to spend large periods of time alone with plaintiff. By virtue of that relationship, [the employee] gained the opportunity to be alone with plaintiff, to touch him physically, and then to assault him sexually. The complaint further alleges that those activities were committed in connection with [the employee]'s employment as youth pastor and priest, that they were committed within the time and space limitations of [the employee]'s employment, that they were committed out of a desire, at least partially and initially, to fulfill [the employee]'s employment duties as youth pastor and priest, and that they generally were of a kind and nature that

was required to perform as youth pastor and priest.

*Id.* Based on these allegations, the *Fearing* court reasoned that "a jury could infer that the sexual assaults were the culmination of a progressive series of actions that began with and continued to involve [the employee]'s performance of [his] ordinary and authorized duties." *Id.* at 375.

> Viewing the complaint in that light, the jury also could infer that, in cultivating a relationship with plaintiff and his family, [the employee], at least initially, was motivated by a desire to fulfill his . . . duties and that, over time, his motives became mixed. We conclude that the . . . complaint contains allegations sufficient to satisfy all three *Chesterman* requirements for establishing that employee conduct was within the scope of employment.

*Id.* The *Fearing* court expressly rejected the Archdiocese's argument that the allegations of the complaint amounted only to legal conclusions or mere restatements of the *Chesterman* factors themselves. *Id.* at 375 n. 5. The court reasoned that:

> An ultimate fact is a fact from which legal conclusions are drawn. A conclusion of law, by contrast, is merely a judgment about a particular set of circumstances and assumes facts that may or may not have been pleaded. . . . Allegations of when particular conduct occurred, of the motivation behind that conduct, and of the employment-related nature of that conduct all are assertions of fact, which can be proved or disproved.

*Id.* (citations omitted).

The *Fearing* court further expressly rejected the argument that, because the alleged sexual abuse could not reasonably have furthered any interest of the employer, it could not have been within the scope of the employee's duties, reasoning that:

> in the intentional tort context, it usually is inappropriate for the court to base its decision regarding the adequacy of the complaint on whether the complaint contains allegations that the intentional tort *itself* was committed in furtherance of any interest of the employer or was of the same kind of activities that the employee was hired to perform. Such circumstances rarely will occur and are not, in any event, necessary to vicarious liability. Rather, the focus properly is directed at whether the complaint contains sufficient allegations of [the employee]'s conduct

that was within the scope of his employment that arguably resulted in the acts that caused plaintiff's injury.

*Id.* at 375-376 (emphasis original).

The *Fearing* court specifically distinguished the facts before it from those where the circumstances of employment merely created an *opportunity* for an intentional tort to be committed, indicating that mere opportunity was not sufficient to support a finding of vicarious liability:

> Here, plaintiff alleges that [the employee] "used and manipulated his fiduciary position, respect and authority as youth pastor and priest" to befriend plaintiff and his family, gain their trust, spend large periods of time alone with plaintiff, physically touch plaintiff and, ultimately, to gain the opportunity to commit the sexual assaults upon him. A jury reasonably could infer that [the employee]'s performance of his pastoral duties with respect to plaintiff and his family were a necessary precursor to the sexual abuse and that the assaults thus were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee]'s employment.

*Id.* at 377 (citation omitted).

Finally, the *Fearing* court also affirmed the well-established proposition that "[w]hether an employee has acted within the scope of employment at any given time generally is a question for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the facts pled." *Id.* at 374.

The Oregon Court of Appeals applied precisely the same reasoning in *Schmidt v. Archdiocese of Portland* ("*Schmidt I*"), 218 Or. App. 661 (Or. Ct. App. 2008), another case involving alleged sexual abuse perpetrated upon a minor by a priest employee of the Archdiocese. In *Schmidt I*, Father F., one of two priests alleged to have molested the plaintiff during his minority, was present when the plaintiff, then aged seven or eight, fell while rollerskating and

Page 21 - OPINION AND ORDER

skinned his knees. *Schmidt I*, 218 Or. App. at 665. Fr. F. helped the boy to his feet, took him into

a church basement on the pretext of examining his scraped knees, and there sodomized him. *See*

*id.* The plaintiff had never met his abuser before the incident occurred. *See id.* at 667, 694.

In analyzing whether the priest's employers could be found vicariously liable for their

agent's sexual assault, the *Schmidt* court affirmed the *Fearing* court's holding that:

> in the intentional tort context, the relevant question is not whether the intentional
> tort itself was committed in furtherance of any interest of the employer or involved
> the kind of activity that the employee was hired to perform [but]
> [r]ather. . . whether there is evidence of acts that were within the scope of
> employment that, in turn, **resulted in** the acts that caused the plaintiff's injury.

*Id.* at 690 (emphasis supplied). Applying that analysis, the court found, first, that the record

contained no evidence that Fr. F. had, as had the priest in *Fearing*, cultivated a relationship of

trust with his victim before assaulting him. *See id.* at 694. Next, "[a]s an alternative to cultivation

of a trust relationship as a basis for imposing vicarious liability," the court analyzed the priest's

conduct immediately preceding the assault to determine whether the record contained "evidence

of conduct by [Fr. F.] that was motivated, at least in part, by a purpose to serve the archdiocese;

that was of a kind that [Fr. F.] was hired to perform; and that resulted in the acts causing plaintiff's

injury" *Id.* The court found that the record contained no evidence from which a jury could

conclude either that the priest had been motivated to serve his employer by picking up the fallen

child and taking him into a church basement or that helping fallen children was among his

authorized employment duties. *See id.* at 695-696. The court expressly found evidence that

Roman Catholic priests were expected to care for their parishioners insufficient to establish a

particular employment duty to do so. *See id.* ("[a]bstract doctrine regarding the status of priests

within the Catholic Church sheds no light on the question whether the particular actions at issue

here were employment duties imposed on [this priest], in his capacity as a parish priest of St.

Mary's Church, by the archdiocese"). Similarly, the court expressly found "evidence relating to

the respect and obedience that parishioners are trained to show to priests" – including plaintiff's

own affidavit that he believed from Catholic teaching that he had no choice but to obey a priest's

commands – irrelevant to the question whether Fr. F. was carrying out authorized employment

duties when he took the boy into the church basement. *Id.* at 696. Based on these findings, the

court affirmed summary judgment in favor of the employer defendants in connection with the

abuse perpetrated by Fr. F. *See id.*

The *Schmidt I* plaintiff had additional claims arising out of allegedly sexually abusive

conduct perpetrated by a different priest, Fr. C. *See id.* at 665-666. The *Schmidt I* court

determined that the claims arising out of Fr. C.'s conduct were time-barred. *See id.* at 687. The

Oregon Supreme Court reversed the *Schmidt I* court's dismissal of those claims on statute of

limitations grounds. *See Schmidt v. Mt. Angel Abbey*, 347 Or. 389, 408 (2009). Following

remand, the *Schmidt III* court considered whether Fr. C.'s employer could be held liable for an

intentional tort arising out of Fr. C.'s conduct:

> The record shows that [Fr. C.] was plaintiff's faculty advisor and dormitory
> proctor and that he asked plaintiff to meet with him in his office during a time
> when he had authority over plaintiff. There is evidence that the allegedly abusive
> conduct occurred during the last 10 minutes of a 30- to 45-minute encounter. A
> jury could reasonably find that the act of counseling plaintiff on the subjects of
> sexuality and reproduction was within the scope of [Fr. C.]'s authority and
> responsibility and that, as plaintiff's faculty advisor and dormitory proctor, [Fr. C.]
> was partially motivated, at least initially, to fulfill those employment duties. A
> jury also could reasonably infer that the alleged abusive conduct resulted from the
> employment-related conduct. We thus conclude that the record on summary
> judgment gives rise to questions of fact as to whether acts within the scope of [Fr.
> C.]'s employment resulted in plaintiff's injuries.

*Schmidt III*, 235 Or. App. at 522-523.  The *Schmidt III* court's reasoning thus constitutes neither a

departure from nor even an extension of earlier Oregon *respondeat superior* jurisprudence, but

rather constitutes a straightforward application of the rule articulated in *Fearing*.  However, the

*Schmidt III* court offered a further observation that, while also a pure restatement of existing law,

nevertheless bears on the archdiocesan defendants' futility argument:

> In defendant's view, *Chesterman* and *Fearing* have drawn a narrow exception
> around a general rule that sexual assaults are not within the scope of employment
> and that, in order to give rise to a triable question of fact as to vicarious liability,
> the record must contain evidence of a pattern of grooming over a lengthy period of
> time or that the defendant used or manipulated a position of trust to ingratiate
> himself with the plaintiff or to create an opportunity for sexual abuse.  We reject
> that contention.  Although the court held in *Fearing* that such facts would be
> sufficient to establish the connection between the employment and the abuse. . . ,
> we do not think that the case stands for the rule that an employment connection is
> established only by such conduct.  The necessary employment connection is
> established by evidence that acts within the defendant's employment resulted in
> the acts that caused the plaintiff's injury.

*Id.* at 523 (citation omitted).

The proposed new allegations in support of the four *respondeat superior* claims, if

permitted, would allege a basis, in the alternative to the previously pled "grooming" activity, for

establishing that the harm Jane suffered was caused by actions taken in furtherance of Fr. J.V.H.'s

employment duties.  While it may be doubtful that Jane will ultimately be able to establish the

factual premise that the abuse she suffered was caused by Fr. J.V.H.'s status as a priest – the

allegations of Jane's complaint establish that the abuse started before J.V.H. was ordained – her

legal theory is sound, and the proposed amendments therefore not clearly futile.

Finally, Jane argues that the proposed amendments are justified in part by relatively

recently acquired evidence that the abuse she suffered occurred in connection with priestly duties

Fr. J.V.H. conducted in the homes of his family members. Defendants do not contest that the evidence regarding J.V.H.'s performance of priestly functions in Jane's home has developed through discovery since this action was first filed. For purposes of the motion to amend, I therefore accept as satisfactory Jane's explanation of why her new theory of causation was not pled earlier in these proceedings.

Because permitting the proposed amendments would not cause prejudice to any party, result in futility, or unduly delay these proceedings, and because it does not appear that the amendments were proposed in bad faith or for dilatory motive, the motion for leave to amend is granted in connection with the proposed amendments to add new allegations in support of Jane's assertions of the archdiocesan defendants' *respondeat superior* liability.

### E. Allegations of a "Special Relationship" and Allegations Regarding "Conditioning"

Defendants argue that Jane should be ordered to amend her complaint to remove all allegations of any "special relationship" giving rise to a duty of care in support of her negligence claim, and to remove all allegations that Jane was "conditioned" to respect and obey priests. While I did, in my Findings and Recommendation (#82) dated April 8, 2010, find that the special relationship alleged between Jane and the defendants was not of a kind that would give rise to a duty of care, I did not suggest that inclusion of the challenged allegations in Jane's pleading were in any way prejudicial or otherwise improper. There being no basis in law for granting defendant's request for an order requiring that these allegations be stricken from Jane's complaint, the request is denied.

II.    **Motion for Protective Order**

The archdiocesan defendants move for an order as follows:

(1)    A protective order against plaintiff's requests for discovery seeking comprehensive financial information about the Archdiocese . . . ;

(2)    To the extent that this Court denies the Archdiocese's motion for a protective order against plaintiff's requests for discovery relating to comprehensive financial information about the Archdiocese, a protective order staying such discovery until after this Court has ruled on motions for summary judgment against plaintiff's punitive damages claim;

(3)    A protective order against plaintiff's requests for discovery seeking information about unrelated allegations of past sexual abuse accusing persons other than J.V.H. . . . ;

([4])    If a protective order as requested above is not allowed, then setting a schedule for briefing the specific objections made by the Archdiocese as to the individual, broad requests for information requested in the Plaintiff's Fourth Request for Production of Documents dated November 25, 2009.

To obtain a protective order, the party resisting discovery or seeking limitations on production or dissemination of discovered documents must show "good cause" for its issuance by demonstrating harm or prejudice that will result from the discovery. Fed. R. Civ. P. 26(c)(1). "For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips*, 307 F.3d at 1210-1211, *citing Beckman Indus., Inc. v. International Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) ("broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test"); *see also San Jose Mercury News, Inc. v. United States Dist. Court - N. Dist.*, 187 F.3d 1096, 1103 (9th Cir. 1999) (to obtain a protective order a party must make a "particularized showing of good cause with respect to any individual document"). The Ninth Circuit has characterized the burden the resisting party must meet as "heavy." *Blankenship v.*

Page 26 - OPINION AND ORDER

*Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)

If the party seeking protection establishes that the requisite particularized harm will occur absent a protective order, the courts must then balance the public interest in access to the information against the party's private interest in shielding it from public scrutiny to determine whether a protective order is appropriate. *See Phillips*, 307 F.3d at 1211, *citing Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).

Moreover, Local Rule 26.6 provides as follows:

> A party or person asserting there is good cause for the Court to make an order that would limit access to discovery materials not filed with the Court, or would authorize a party or person to file any materials with the Court under seal, **must show with respect to each particular material or category of materials that specific prejudice or harm will result if no order is granted. The showing must be sufficiently detailed to permit the Court in its good cause examination to identify specific factors supporting entry of the order sought.** Where the order sought would authorize a party to file materials under seal, the showing also must articulate why, as an alternative to filing under seal, the information sought to be protected could not be redacted. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning does not satisfy the requirements of this rule. The showing must be made even if the other party stipulates to the entry of the order.

L.R. 26.6 (emphasis supplied).

The archdiocesan defendants do not argue that they would be prejudiced or harmed in any way if they were required to produce documents within the scope of the requested protective order. Instead, the archdiocesan defendants argue that Jane is not entitled to production of the documents in question, on grounds of relevance, overbreadth and/or undue burden. Assuming *arguendo* that the archdiocesan defendants' arguments established with certainty that Jane was not entitled to production of the documents, they nevertheless fail to establish grounds for issuing the requested protective order. In support of their motion for protective order, it is the archdiocesan

Page 27 - OPINION AND ORDER

defendants' burden to show with respect to individual documents that specific prejudice or harm would occur if the motion were not granted.  Because the archdiocesan defendants have not met their burden, the motion for protective order is denied without prejudice.  This disposition of the archdiocesan defendants' motion should not be construed as suggesting that I would grant a motion to compel production of the documents in question in the event that such a motion were filed.

### CONCLUSION

For the reasons set forth above, Jane's motion (#85) for leave to amend is denied as to the proposed amendments to allege a new claim for institution-wide negligence and otherwise granted, and the archdiocesan defendants' motion (#89) for protective order is denied.

Dated this 12th day of October, 2010.

Honorable Paul Papak
United States Magistrate Judge